May it please the court, Lauren Collins on behalf of appellant Maureen McDermott. I'd like to reserve seven minutes for rebuttal and I'll try to watch the clock. At its core, this is a case about a prosecutor's willingness to engage in prosecutorial misconduct in multiple ways in order to secure a death sentence in a capital case. The misconduct in this case bookended Ms. McDermott's capital case. First, beginning in jury selection, the prosecutor struck nine prospective jurors because of their race. And then at the end of the trial, during a penalty phase closing argument, where she compared Ms. McDermott to a Nazi, a germ, a mad dog, and a sneak, the prosecutor quoted directly from the Bible, suggesting that death was mandated in this case. With the court's permission, I'd like to start by addressing the Batson claim before moving to the certified claim. The Supreme Court prohibits a prosecutor from striking even a single prospective juror based on their race. The only plausible conclusion looking at the totality of the record in this case is that the prosecutor engaged in purposeful discrimination for several reasons. First, the sheer number of strikes in this case shows that this was almost certainly not happenstance. The prosecutor used peremptory strikes against 75 percent, or nine of 12 black prospective jurors, and challenged black prospective jurors at a rate of twice the rate of the non-black jurors. In addition to the statistical disparities in this case, the prosecutor's explanations for striking the jurors don't hold up. She was unable to give specific reasons for striking four of the jurors. The only explanation for the other four was that they would not have been good prosecution jurors on the issue of the death penalty. That's all she ever said on this issue. This explanation was so vague and conclusory as to be meaningless. If we look at what they said in voir dire though, and they said things that expressed hesitancy about the death penalty, why would we say that that was too vague a reason? Because in this case, that conclusion isn't supported by the record, particularly when we compare some of the responses of the struck jurors to seated jurors who also gave similar responses about hesitancy about the death penalty. Without getting into all of the details of the comparative juror analysis, which is set forth rather extensively in the briefing, this is perhaps most striking looking at seated juror Parrison, who gave several statements indicating some hesitancy, including that she would tend not to want to use the death penalty, would need convincing in order to use the death penalty, and that her initial thought was life imprisonment. Counsel, did all of the seated jurors eventually say that they would follow the law as instructed by the trial court? I believe so, Your Honor. Yes. And in striking some of these jurors, the prosecutor misrepresented the record, and for example, she said that she thought some of the jurors in the audience may be better jurors on the issue of the death penalty, but as the California Supreme Court found, there was really no way of knowing which jurors would be called next. Further, looking at the individual jurors, or just briefly, Juror Welch, for example, she said that he favored rehabilitation and counseling, but really he said he favored rehabilitation and counseling for unintentional crimes, which would be crimes that would not apply or qualify for the death penalty. I thought Mr. Welch said that he disfavored the death penalty, but he would apply it for repeaters or for violent crimes. Excuse me, I missed the last statement. He said he would apply the death penalty for violent crimes. And for repeaters. My notes say and for repeaters. I'm not sure about for repeaters, but ultimately, he would have been able to impose the death penalty. And so, looking at the statistical evidence and this comparative analysis, particularly with respect to willingness to impose the death penalty, these facts all point towards racially motivated strikes. It struck me that he was striking a lot of Democrats, and that there would be possibly an overlap between race and party in this situation. I don't have the statistics on that particular comparison. This was something I was looking through when I was going through all the jurors. I haven't done that comparison. But was there anything racially charged about any of the facts here? Like, I'm trying to understand why there would be a motivation to strike based on race in this case, and I'm struggling to see it. Well, I think that's not the question. The question is more, does the record show a systematic, purposeful discrimination, regardless of the facts of the case? There were not specific facts that I can point to where this was a racially motivated crime. Certainly wasn't racially motivated crime. The prosecutor made a statement that, in fact, she would like to have black jurors because some of the witnesses were black. But I think, ultimately, that explanation doesn't overcome the statistical disparities. But if the statistical disparities might overlap with other things, maybe they're Democrats, maybe they have a view on the death penalty, maybe there are a lot of other things going on. I'm not sure why. It just feels a little odd to assume, when they're overlapping possible explanations, that this one is race when there isn't really a reason why it would be race, given what they were having to argue in this case. Well, those were not the reasons that were stated by the prosecutor. The reasons that were given were that they may not have been good jurors on the issue of the death penalty. And so, we can't make up reasons for striking these jurors that the prosecutor didn't give. And if the court has no further questions on the Batson claim, I can turn to the certified claim. So, the prosecutor quoted directly from the Bible in this case and said, whoever striketh a man a mortal blow must be put to death. And also, when a man kills another after maliciously scheming to do so, you must take him from my altar and put him to death. As the district court recognized, this was clearly improper and also prejudicial for a number of reasons. First, counsel, I know that would be improper under Ninth Circuit law. But are there any Supreme Court decisions that have said that references to the Bible are improper? And so, the Supreme Court has clearly established that principle. Your Honor, well, there are not Supreme Court cases specifically addressing Bible arguments. Other well-established Supreme Court law supports these principles upon which the claim rests. And the district court also cited Caldwell and Chandler. And in a death penalty case, a prosecutor cannot make arguments suggesting that the jury, that a higher law or invoking extrajudicial authority. And in Caldwell, the jury was led to believe that the responsibility for determining the sentence was with a higher court. And here, the prosecutor's argument suggesting that a higher law, biblical law, was ultimately responsible for determining the appropriate sentence in this case would violate clearly established federal law. Also, Chandler v. Florida held that verdict has to be based on the evidence and the facts of the case and the relevant law. So, the well-settled principles of federal law govern even if there is not a specific case that the Supreme Court has addressed in terms of Bible quotes. And at least one circuit, the Sixth Circuit in Cawthorn v. Colson, has relied on clearly established federal law in order to grant relief in a claim where the prosecutor made arguments based on the Bible. So, even if we were to agree with you on a direct appeal on habeas, we have to apply AEDPA. And I guess the first question I have, you argue that you're, in your brief, that the appropriate decision for review is the California Supreme Court's decision on direct appeal, but then there's some suggestion that maybe it's the decision on the third habeas, which is it? Yes, Your Honor. As we argued in the briefing, the analysis depends on which is the relevant state court decision, but either way, we can establish entitlement to relief. In the briefing, we point out that we look to the reasoned opinion on direct appeal. Because we are, we're going to be looking through to the reasoned decision on direct appeal. And the 2007 denial cites Inouye-Waltrius indicating that the claim had been considered already on direct appeal. But it also said that it was denied on the merits. So why don't we use the denied on the merits part from the 2007 as essentially a new merits decision, regardless of the procedural issues? And that is another route that the court could take. And if the court considers the exhaustion denial to be the relevant state court decision, then all we are dealing with is a merits denial and then a citation to Inouye-Waltrius, which is not a procedural bar. And then the court would consider the merits under 2254. But then if we go into, if we're looking at the merits decision, and it was a summary denial, we then apply Harrington v. Richter, and we have to see if, imagine if there's any reasoned basis upon which this conclusion is sustained. I think one way that I would approach this would be to remember that the relevant state court decision is one decision and not multiple decisions. And in the 2007 habeas denial, the California Supreme Court denied the claim on the merits and also with this citation to Inouye-Waltrius. It didn't reference the contemporaneous objection bar. And so the only issues that we're dealing with, if we're looking at the 2007 denial, is effectively the merits denial. And then we review that under Harrington, as Judge Wardlaw was suggesting? And in terms of thinking about what the court might have meant by the merits, we sort of think about the best reason they could have given for denying the claim on the merits. On the merits, yes. Yes. Yes. And then we ask whether that reason that we imagine they would have given is, survives under AEDPA or could be reversed under clearly established law. Yes, Your Honor. And thinking about the analysis under 2254D with clearly established federal law, as we, as I was just talking about, this clearly established federal law as the basis of the claim are these bedrock constitutional principles that a verdict, particularly a verdict or a death sentence, can't be based on argument that goes outside of the facts and the law of the case. And that's in the 2254D1, unreasonable application of clearly established federal law. But there's also, in the merits analysis, an unreasonable application of the facts under 2254D2. And for that, we can look to the reasons that the district court found that this claim was meritorious in finding that the state court decision was unreasonable on these facts for determining that the biblical arguments were not prejudicial or that it didn't consider how strong the biblical argument was in the context of this case, particularly. Can you point to any case where a state court was reversed under AEDPA, kind of just because of bedrock principles? So I feel like in clearly established law, in qualified immunity, we have the hitching post case, like there's the concept that some kinds of torture are so obviously improper that you don't need a case. But I don't know if we have something like that in AEDPA, where it says under clearly established by the Supreme Court, whether we can do that same kind of general bedrock principles. I think I would point the court to Panetti. I believe Panetti is the case that holds that general principles can constitute clearly established federal law, if I'm understanding the court's question. And can I ask you, I know one of the cases you're relying on is Caldwell. In Caldwell, the jury was told that there would be another level of review. So the I guess I'm having trouble understanding, even if it was improper to talk about the Bible, I'm having trouble understanding why it took away the jury's responsibility. It seems like they still would have had to make the decision and didn't think anyone else would make the decision here, right? Yes, they would still be making the decision. But the suggestion is that this is a decision that is approved by God, essentially. Or this, you don't have to worry about what the statutory factors are, because the Bible says that when someone strike at the man, you must put him to death. And so that's the comparison here. Could I ask, if you won on this argument about the penalty phase, would it change your client's conditions of confinement? I'm a little unclear what's going on with death row in California right now. I don't believe a penalty phase grant of relief, practically speaking, would change the conditions of confinement in terms of day to day. And so if we thought that California was never really going to start executing people again, is there basically no practical effect of the of the penalty phase argument here? Well, there would be a benefit to being not under a death judgment anymore. If not understanding that there is currently not a active seeking execution, but the difference between being under a death judgment and not being under a death judgment, whether it affects custody status or not, is still a significant one, particularly for the person who is under that judgment. Because of the fear that California might start executing people again? Certainly. There's always the possibility that California might start executing again. And yes. So right now the status is, as I understand it, California has dismantled its capital apparatus. Is that correct? Yes. Is Ms. McDermott still on death row? Not on death row. She has moved to a general population. If that makes a difference. In California are all the formerly incarcerated persons on death row now in the general population? Not all. Not all. Okay. San Quentin is in progress, but she's not at San Quentin anyway, right? Correct. If the court, I see my time is running low. I just would like to briefly, if the court has no further questions about the certified claim, I'd like to touch upon ineffective assistance of counsel at penalty. At what point, I gather you raised that claim? No. At what point did Ms. McDermott raise that claim? I was talking about the ineffective assistance of counsel at the penalty phase. So this claim was raised all throughout. Right. But was there ever one specifically raised about ineffective assistance for failure to object to the biblical argument? That claim was raised on direct appeal and exhausted on direct appeal. But the state court at that point said it was proper for habeas, not for direct appeal. Correct. And then it wasn't raised again on habeas as far as I can tell. Is that right? That's correct. That specific claim. The claim that I was hoping to speak to just briefly is the other uncertified claim, which is failure to investigate and present evidence of Ms. McDermott's background. Failure to present what? Excuse me, Your Honor? evidence of Ms. McDermott's background and childhood and her life basically before age 33. Just briefly, counsel, after the guilt verdict, told the court that they had not yet conducted their penalty phase investigation because they hadn't wanted to expend taxpayer money. And they then took a brief recess to do the most bare investigation of Ms. McDermott's background. And as a result, the jury only heard that Ms. McDermott was well liked at work and by her friends and that she had good behavior in trial. But the jury didn't hear that she had a childhood that involved poverty and instability and had an abusive parent and really all of these things that have traditionally been looked on as mitigating evidence. So the question in this claim is, is there a reasonable probability that only one juror or that at least one juror would, having heard some of that evidence, voted for life? And I submit there was. And if the court has no further questions, I can reserve the remainder of my time. All right. Thank you, counsel. Mr. McCutcheon? Yes. Good afternoon, Your Honors. And may it please the court, Deputy Attorney General Seth McCutcheon on behalf of the state. I'd like to start with the certified issue and then I'll address the two uncertified issues that were brought up. As far as the prosecutorial misconduct claim, the district court correctly recognized that the claim was procedurally barred and that was because of the California Supreme Court's imposition of the contemporaneous objection rule. I think there's some confusion as to what our argument is as to operative opinion. And it is the second habeas denial in which the California, or excuse me, yes, in which the California Supreme Court not only denies claim 12 on the merits, but also separately and independently on the ground that it was raised and rejected on appeal. And the state habeas, were there three state habeas petitions? There were three state habeas. None of the claims at issue today were raised in the third habeas. In the third. So this is what we're now talking about. I just want to make sure. The 2007. That's the second habeas and yes, that is the operative ruling. Okay. And I had not understood you in your brief to argue that in that 2007 state habeas decision, the part we should be thinking about is the procedural part. I had understood you to be on the merits. It's both. And I apologize if it wasn't clear, but the California Supreme Court has a fully explained ruling and it has an explained procedural ruling as well as a merits ruling. And in its language, it states that this claim, this ground, or excuse me, this claim, claim 12 was separately and independently denied on the ground that it was raised and rejected on appeal. I thought that there was law saying that in state habeas, things that had to do with sort of habeas procedure are not procedural bars in the same way as like what happened on direct review was. Right. Because you don't have to bring habeas. So I don't think this thing about having been raised before, which is like a successive habeas procedural reason, either is something we need to worry about or something you argued in your brief as I understood it. Well, I think. Regardless of how clear we were in the brief, it doesn't change the fact that the California Supreme Court said what it said. But if it doesn't matter because it released a habeas procedure, don't we look at the merits part? And so this is like an irrelevant discussion. If the court disagrees, certainly we'll look at the merits because there is there is no. Well, tell me why it's not an irrelevant discussion, because I guess I'm not following that. And that's because the California Supreme Court inciting Waltrius and we are not suggesting that the Waltrius is a bar in front of this court. If you're not suggesting it's a bar, why are we talking about it? Because of what the California Supreme Court said outside of the Waltrius citation. It's just very it's a very strange opinion because they deny it seems to me denying 12, like three separate times on three separate grounds. And one is the merits. So what is the which way do we look? Well, it makes a difference, right? What our analysis it does make a difference. But our analysis is it does make a difference. The Supreme Court has said that we should give meaning to all aspects of a state court ruling. It has also said that we should give the benefit of the doubt to state court rulings. And I think the best reading of the state court ruling is that they were not only denying the claim on the merits, but also denying it for the same reasons that they denied it on direct appeal, which was a contemporary. You're saying it was like an incorporation by reference? Yes. And I and I don't think that it would be logical to read it any other way. I do think you may have waived this and I think it's waivable where I think unless you can tell me that it's not. Where did you argue this in your brief that that's how we should understand that? Again, we perhaps weren't as clear as we should have been in our briefing. But did you argue it or did you not argue it? We did not. We did not specifically argue that that this language that was an incorporation by reference. Correct. And I think we have cases at least at least a Chappelle, which I don't think was cited in the briefs, but I'm not certain about that, where there was this kind of state habeas that had habeas procedure plus merits. And we reviewed the merits under AEDPA and forgot about this. These equivalent state habeas procedure denial reasons. Well, I think that stands for the idea that if it's easier to dispel the claim on the procedural grounds to deny the claim should be ignored. Well, do you have an argument? Do you have a case for the proposition that if the state doesn't assert the procedural grounds, we still have to consider them? I do not. So I think we're at the merits then. If we could talk to the merits, talk about the merits. I mean, on the merits, there is AEDPA deference. And as Judge Gould pointed out, there is no U.S. Supreme Court precedent on point holding that biblical references made during penalty phase argument are amount to per se constitutional error. The California Supreme Court has recognized that at times biblical references are permissible. Expressly when a prosecutor or somebody is pointing out to religious jurors why the applicability of the death penalty in secular law does not contravene biblical doctrine. And I think if we look at exactly what the prosecutor says. Sorry, what case says that that's proper to do? California Supreme Court has recognized that it's permissible to do that. OK, so we could disagree with that. Certainly. Certainly. And in fact, if they've said that, that might hurt you here if that's what they're thinking. Excuse me? If that's what they're thinking in denying this on the merits, that might not be helpful to you. Well, I guess my point is that because there is no U.S. Supreme Court clearly established law prohibiting biblical references, we would look at the comments themselves and first determine whether they were improper. And what I was getting at is that the California Supreme Court has recognized that at times it can be permissible to refer to the Bible. In one instance, when you're explaining that the Bible does not contradict the application of the death penalty. And I think if you look at what was said by this prosecutor and you compare it to cases that this court has found to be in violation, like Sandoval or Roybal, excuse me, that was a district court case. But in other scenarios where prosecutorial comments have been found to be up in the problematic area when they are saying that God compels. Isn't that what the prosecutor said here that the Bible compels you when there's been some kind of a mastermind scheme like this, the Bible compels you to impose the death penalty? No, I don't think that's what the prosecutor was saying. I think I have the language right here. And I also have the language right in front of me. When a man kills another man after maliciously scheming to do so, you must take him from my altar and put him to death. And right before that, she explains that these are several references to the death penalty in the Bible. So she's simply giving examples of how the Bible does not contravene secular law as far as applicability of the death penalty. But secular law does not say you have to give the death penalty. No, it doesn't. And I think to understand the prosecutor's argument, and this is one of the problems with the district court's ruling, is the district court found that the prosecutor was unreasonable in her anticipation of defense counsel citing the Bible on penalty phase. First, I don't think it was unreasonable because the defense had cited the Bible during guilt phase. So in light of this kind of unique posture that the prosecutor was in at penalty phase where she had to anticipate what was going to be argued, she was aware that defense had argued or referenced the Bible on guilt. So in anticipation of that, she preempted what I think is a reasonable expectation that the argument would be the Bible says thou shalt not kill. So the Bible says we should not apply the death penalty. And I think if you look at the wording of the prosecutor, that's exactly what she was combating. She stated, I don't know much about the Bible. Most biblical scholars, as I understand it, interpret the commandment thou shalt not kill as an actually meaning thou shall not commit murder. So I think right there she's combating the notion that thou shalt not kill means. Was there not going to be a rebuttal of any sort? There was not. And the defense never did make this argument, right? He didn't make the full throated argument that I think prosecutor was anticipating. But again, it was a reasonable expectation based on what he had argued at guilt. He did reference the Bible at penalty phase in response to what she said. But again, I don't believe it was the full throated. And what was reference to the Bible at guilt? At guilt, defense counsel gave a lengthy narrative recounting the story of Noah's Ark and how it in some way related to reasonable doubt. So he, but it really wasn't connected to whether someone should be given the death penalty. Well, no, but I mean, we were at the guilt phase at that point, but it wasn't in reference to the Bible. It was a very lengthy biblical story that he narrated to them. So I think based on that, I think the prosecutor was reasonable in expecting that he would do the same on penalty. Open the door to the whole Bible. Well, I mean, well, it's not best practice certainly to get into Bible references during argument. I do think it was reasonable for her to anticipate that it would be brought up. If we do look at not only what was said, but in the context of the entirety of the argument, this was two short quotes. It was 13 lines within 85 pages of argument. And another thing that's contrary to what the district court stated is that I believe he phrased it as these arguments comprised the remaining of her penalty phase argument. That's simply not true. After the prosecutor made this short remark, she moved immediately on to other areas that she was anticipating the defense would raise. So it was not this, as the district court characterized it, this crescendo or this grand finale moment that the prosecutor led into. It was very benign and she moved on immediately from it. So not only do I not think that these comments rise to the level of being improper such that there was misconduct, I also don't think that McDermott can demonstrate prejudice. I think if you look at these comments compared to the really mountain of aggravating evidence that was at issue in this case, you had not only the crime itself, which was McDermott paying an individual to murder her friend and roommate for money and to take over the house, but to do so in a really vicious way. I mean, there was first an attempt that didn't succeed and then after that she cared for this person all while plotting to do it again. The first attempt involved instructions to mutilate the body, which ultimately, that is what the person was again instructed to do and did ultimately do after stabbing him 44 times. So this crime was the prior incident of her, another arranged attack against someone else that she knew, also for money. She wanted this person's job, so she elicited the help of this Jimmy Luna again and stalked this individual until they could figure out the right place and time and she had attack him with a knife. And again, as with Mr. Eldridge, the victim of the murder, Mr. Bell, she, after the attack, offered to care for him and offered to remove his stitches. So you had a lot of this really callous facts. Can I bring you back to whether these Bible quotes were prosecutorial misconduct? I understand you're making a prejudice argument, but why doesn't law that says the death penalty can only be based on the law and facts mean that this was an error under clearly established law? I don't think the prosecutor was asking the jury to rely on anything but the law and the facts. I mean, so if we disagree with you and think that a juror who's religious, who's told the Bible tells you you have to kill someone who kills, um, if we think that's a factor other than the law and facts in this case, what are we supposed to do? Well, I mean, I guess that this court would have to also find that making those statements is contrary to clearly established law. And I don't think that there is clearly established law on point. I don't think that she's appealing to a higher, higher authority and or suggesting that the juror to the jurors that there is a higher authority that they if we think she is suggesting, though, that the jury should give the death penalty for a reason other than the law and facts in this case, would that be a violation of clearly established law? Perhaps. And at that point, if this court does find that her comments were improper such that we would look at whether they so infected the trial is to render it a denial of due process. Then we're going to talk about prejudice again anyways. And I don't think that McDermott can has demonstrated prejudice. Counsel, could you give me your like a summary of your argument as to why there's no prejudice? Certainly, the comments were benign. I don't think that the prosecutor was suggesting anything improper. They were extremely short. They, again, were 13 lines, two quotes within 85 pages of arguments. They did not consist as the district court characterizes it. The remainder of her argument, she immediately moved on and started talking about other factors that she anticipated the defense would would address. And in light of the kind of innocuous comments and the aggravating evidence that existed, it's not reasonably likely that there would have been a different verdict. Thank you. Unless the court has no other questions on that point, I'll turn to the. Could I just ask you to what is the California case that you were talking about where the state court says this is proper? Zambrano. And it's in our briefing. And I'd like to briefly discuss the two uncertified claims that were mentioned. First, the Batson claim. The California Supreme Court reasonably concluded that the prosecutor had excused the them had raised concerns as to their ability to vote for death. And the district court, after engaging in comparative analysis, concluded that fair-minded jurists could agree with the state court decision. All of the jurors had made comments during either voir dire or in the questionnaire that did raise concerns. A couple of things I just wanted to correct, and that was as to interrupt you, but I thought you said a thing, a case that started with a Z. And I'm looking at your brief, and I don't see that. And I just want to make sure I actually know what you're talking about. Could you tell me the site or the name again? It's People versus Zambrano. Yes. Oh, is that what the problem is? Okay. I'm sorry. Thank you. No, that's my fault. Sorry, Your Honor. And that is in our brief, I believe? Yeah, it is. Yes. Okay. So back to the Batson issue, one thing I wanted to correct is that Juror Welch was the juror that stated that she could not, she did not, excuse me, I'm not sure if that's a she or a he. Juror Welch indicated that they would not, they did not think they would be able to vote for the death penalty if the person did not have prior offenses. And in this instance, McDermott did not. So it was reasonable for that touched on. There is no other evidence beyond the statistical disparity that supports a finding of racial motivation. The victim was white. The defendant, McDermott, is white. The crime involved her manipulating two black men to murder this white individual. Evidence would have came of her using racial slurs. Did both of the black men testify and were they cooperating? Yes, yes. They were cooperating witnesses for the prosecution. So there were witnesses that were black. There was going to be evidence that she used racial slurs. So in looking at the to show that these strikes were racially motivated. And then finally, turning to the ineffective assistance for failing to mitigate, the California Supreme Court could have reasonably concluded that petitioner could not show either deficient performance or prejudice. Um, this was a trial counsel who undertook extensive investigation into mitigating evidence. He employed four mental health experts. He talked to a criminal justice reform expert. He hired two investigators. He talked to friends, colleagues, people that worked at the prison. There's there seem to have not have asked about the childhood. Uh, we don't know what he did because there is no declaration from trial counsel. Strickland says we should presume competence, and that's exactly what we should do. Uh, there's nothing to suggest that he didn't investigate her childhood. Um, and well, the parents say no one asked us anything at least, right? The family says they didn't even ask us. The mother said that the mother said that in her declaration. Um, I think he could have gotten into a childhood history for many other people other than the mother. Um, but we have no billing records or anything to suggest that they did, right? Well, we have billing records to suggest that they talked to plenty of other family members and plenty of friends. Um, there's, uh, as I said, there's there was extensive investigation done. Were any of the friends childhood friends? I'm not sure. I don't know. Um, but again, you know, we're we presume competence. So, uh, this this failure to investigate really, really, really fails on its face without more. Um, as far as what this unremarkable evidence would have done. I mean, this was evidence that, uh, was that she dropped out of school in 10th grade that she suffered migraines that her father called her ugly. Um, although there was evidence of poverty, it wasn't the abject poverty that normally makes a difference. So it wasn't she was sleeping on the streets or eating out of garbage cans. Um, it was just that her father drank and would be in between jobs. And so they were constantly moving. Um, so this, this unremarkable evidence, uh, really would have also undercut some of the things that, uh, defense counsel did present, uh, namely evidence from the brother who who testified that she was a loving daughter, that she sent money back to her elderly parents. Um, uh, evidence of, uh, her potential, uh, to to adapt and succeed in prison. I think defense counsel put his best foot forward, uh, when he attempted to portray McDermott as this individual who had, uh, nothing but potential in the prison system and had adapted well. He, uh, presented, uh, evidence from co-workers explaining how she was a caring nurse and, uh, a capable professional. He presented evidence from prison workers who talked about her, uh, rescue of another inmate who was choking and prevention of another inmate from, uh, committing suicide. So it, it, it, it was a, uh, an obvious theme that defense counsel was getting across that this person, uh, had the potential, uh, to be a very, um, uh, someone that would benefit and, and help out, uh, in prison and benefit other prisoners. And I think if you start to present these other themes of, uh, she suffered these, these childhood hardships that they, that she never got over and it, uh, at, at least, uh, played into her murder of an individual, it calls into question her potential and, uh, her ability to adapt in prison. Um, and, and, and also as we point out in the brief that, uh, portraying herself as a victim, uh, didn't work at the guilt phase. So there was no reason to think it would work at the penalty phase. So it was a reasonable tactical decision not to present this evidence. And for all of these reasons, I would ask this court to affirm the district court's rejection of these claims. Thank you very much counsel. Thank you. Ms. Collins. Thank you, Your Honor. I'd like to just mention a couple things that, um, respondent counsel said. It was not reasonable in this case to say that the prosecutor was merely anticipating defense counsel argument in the penalty phase. I'm not aware of any case that allows the prosecutor to preemptively commit misconduct in this way or any way. And the way that the prosecutor discussed the Bible so clearly and strongly was qualitatively different from the way the defense counsel referenced the Bible at the guilt phase, where he told a story from the Bible about Noah's Ark in discussing reasonable doubt. And so I also don't think it's enough to say that these were, these references were brief to the, to the Bible quotes, um, or that they were benign. To paraphrase the Supreme Court in a different context, some poisons are found. In this case, the quotes here were focused, unambiguous, and strong, and were the grand finale to an argument that, um, was to a lengthy argument. And considering the context of the prosecutor's closing argument, which involved other use of language, very strong language, calling Ms. McDermott evil, equating her to a germ and a snake, it's, it just can't be said that this was not prejudicial. And so for that reason, um, I would urge the court to divorce the district court and grant habeas relief. Thank you very much, counsel. Um, McDermott versus Johnson, uh, will be submitted. And this session of the court is adjourned for today.
judges: WARDLAW, GOULD, FRIEDLAND